IN THE UNITED STATES DISTRICT COURT

THE DISTRICT OF UTAH,  CENTRAL DIVISION

| | |
|---|---|
| AIMEE MORRISON,<br><br>                Plaintiff,<br><br>v.<br><br>CLEAR MANAGEMENT SOLUTIONS,<br><br>                Defendant. | **MEMORANDUM DECISION &<br>ORDER CERTIFYING CLASS &<br>GRANTING SUMMARY JUDGMENT**<br><br>Case No. 1:17-cv-51<br><br>Judge Clark Waddoups |

Before the court is Defendant Clear Management Solutions' Motion for Summary

Judgment (ECF No. 20) and Plaintiff Aimee Morrison's Motion to Certify Class (ECF No. 32)

and Motion for Summary Judgment (ECF No. 36). Ms. Morrison alleges that she and other

similarly situated individuals received collections letters from Clear Management Solutions

(CMS) that violated the Fair Debt Collection Practices Act and the Utah Consumer Sale

Practices Act. CMS argues that it did not violate the FDCPA because it is not a debt collector

and therefore does not fall under the Act. The court heard oral argument on June 28, 2018. (ECF

No. 43.) For the reasons stated herein, the court CERTIFIES the class, DENIES CMS's Motion

for Summary Judgment, and GRANTS Ms. Morrison's Motion for Summary Judgment.

## CLASS CERTIFICATION

Ms. Morrison seeks certification of the following classes:

> All persons with addresses within Utah; who were sent any communication which was similar or identical to Plaintiff's Exhibit A on behalf of Utah Imaging Associates; to recover a consumer debt; in which this initial communication failed to provide the notice required by 15 U.S.C. § 1962g and/or 15 U.S.C. § 1692e(11); which were not returned undelivered by the United States Postal Service; from April 11, 2016 until April 11, 2017.

(Motion to Certify 2, ECF No. 32.) Ms. Morrison also seeks appointment as class representative. (*Id.*) Finally Ms. Morrison seeks the appointment of David McGlothlin of Hyde & Swigart and Ryan McBride of Kazerouni Law Group be appointed as class counsel. (*Id.*)

Under the Federal Rules of Civil Procedure, "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). The order "must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g)." A class may be certified only if all of the following prerequisites are met:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

*Id.* 23(a); *Shook v. El Paso Cty.*, 386 F.3d 963, 968, 971 (10th Cir. 2004) ("Rule 23(a) requires an analysis of four elements which are preconditions to class certification: numerosity, commonality, typicality, and adequacy of the named parties to represent the class."). "A party seeking class certification must show 'under a strict burden of proof' that all four requirements are clearly met." *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir.2006).

Here, the purported class satisfies the numerosity requirement because there are sufficient potential members "as to make joinder impracticable." *Peterson v. Okla. Housing Auth.*, 545

F.2d 1270, 1273 (10th Cir. 1976). The proposed class is made up of individuals to whom CMS sent the same or similar communications as it sent Ms. Morrison on behalf of the original creditor Utah Imaging Associates (UIA) within a one-year time span. Based on discovery responses from UIA, Ms. Morrison estimates that 40,887 people received such a communication. (Exhibit B ¶ 7, ECF No. 32-5.) Even assuming some of the intended recipients never received or opened the documents, this class of potential plaintiffs is too large to be accommodated through joinder.

Commonality is also met. Commonality exists when plaintiffs share a "common contention . . . that is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Here CMS has admitted that all 40,887 prospective class members received the same or nearly the same collections letter, which did not include the notices that 15 U.S.C. § 1692g and 15 U.S.C. § 1692e(11) require. (Exhibit C 38: 1–18, ECF No. 32-6.) Therefore, common questions—whether CMS was required to comply with FDCPA § 1692g and § 1692e(11) and whether the letter was deceptive in violation of the UCSPA—would resolve plaintiffs' entitlement to relief. If CMS was required to comply with the FDCPA and UCSPA, each of the 40,887 notices it sent would be in violation of the FDCPA, entitling the class members to compensation. Because resolving a single legal issue would resolve the question of CMS's liability under each statute to each member of the purported class, commonality exists.

Typicality is also met. "[L]ike commonality, typicality exists where . . . all class members are at risk of being subjected to the same harmful practices, regardless of any class member's

individual circumstances." *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1199 (10th Cir. 2010). Courts have concluded that typicality is met where each member of the purported class received the same communication in violation of the FDCPA. *See, e.g.*, *Gold v. Midland Credit Mgmt.*, 306 F.R.D. 623, 631–32 (N.D. Cal. 2014) (concluding typicality was met where the plaintiff "allege[d] that she and each class member were sent an identical and unlawful form collection letter and therefore subjected to the same violations of the FDCPA"). Because Ms. Morrison's harm, receipt of a communication that allegedly violated the FDCPA and UCSPA, is typical of the harm to the members of the purported class, this element is met.

Finally, class representation is adequate. Class representation is adequate if the named plaintiff and her counsel (1) do not have "any conflicts of interest with other class members" and (2) "will . . . prosecute the action vigorously on behalf of the class" and if counsel (3) is competent. *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002). First, Ms. Morrison's claims are identical to those of the class and therefore her interests coincide with theirs. And she declares under penalty of perjury that she has no financial interest in the outcome aside from any damages to be awarded.[1] (Declaration of Aimee Morrison ¶ 9, ECF No. 32-1.) And there is no known conflict between Ms. Morrison or her counsel and the

---

[1] CMS argues Ms. Morrison cannot adequately represent the class. It argues, "CMS believes Plaintiff's contention that she satisfies Rule 23(a)(4) is misconstrued. Plaintiff is the spouse of a consumer protection attorney with a working relationship with counsel of record in this case. This working relationship between Mr. Morrison and counsel of record demonstrates a conflict of interest for Plaintiff. CMS would also defer to the Court's discretion in determining whether Plaintiff satisfies Rule 23(a)(4)." (Defendant's Objection 10, ECF No. 37.) CMS provides no further detail about the nature of Mr. Morrison's relationship with counsel or why that relationship should preclude Ms. Morrison from serving as class representative. Without some further discussion of the nature of the conflict, the court cannot conclude that Ms. Morrison's representation would be compromised by her husband's professional relationship with counsel.

class. (*Id.* ¶¶ 6–7; Declaration of David McGlothlin ¶ 4, ECF No. 32-2; Declaration of Ryan L. McBride ¶ 7, ECF No. 32-3.)

Second, Ms. Morrison has declared under penalty of perjury that she understands her responsibilities as class representative, is willing to serve in that capacity, and has hired competent counsel to represent the class. (Declaration of Aimee Morrison ¶¶ 3–5, 8, ECF No. 32-1.) Third, Ms. Morrison's counsel are experienced lawyers capable of serving as class counsel. Their declarations and supporting documents demonstrate they have significant experience serving as class counsel, including in FDCPA actions. (Declaration of David McGlothlin ¶¶ 5–17, ECF No. 32-2; Declaration of Ryan L. McBride ¶¶ 8–19, ECF No. 32-3.) Therefore, each of the elements of Federal Rule of Civil Procedure 23(a) are met.

Having found that the Rule 23(a) prerequisites are met, the court must next "examine whether the action falls within one of three categories of suits set forth in Rule 23(b)." *Adamson v. Bowen*, 855 F.2d 668, 675 (10th Cir. 1988). Here Ms. Morrison alleges her action satisfies both Rule 23(b)(2) and (b)(3) and asks the court to certify a hybrid class. The two categories apply when

> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or (3) the court finds the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the

> particular forum; and (D) the likely difficulties in managing a class
> action.

*Id.* 23(b)(2)–(3). Because she believes this action satisfies the requirements of Rule 23(b)(2) and

(b)(3), Ms. Morrison asks the court to certify a hybrid class, which would entitle the class

members to equitable relief under 23(b)(2) and monetary damages under 23(b)(3). The court first

analyzes whether certification could be proper under either section of subpart (b) and then

addresses the argument for a hybrid class.

Subpart (b)(2) applies if "the remedies the class seeks . . . do not depend on the individual

facts of each case, but apply equally to all cases pending within the class." *Adamson v. Bowen*,

855 F.2d 668, 676 (10th Cir. 1988). But "[f]actually different claims of individual class members

'should not preclude certification under Rule 23(b)(2) of a claim seeking the application of a

common policy.'" *Shook*, 386 F.3d at 971 (quoting *Adamson*, 855 F.2d at 676). The court must

examine "the 'relationship between' a proposed class, 'its injuries, and the relief sought.'"

*Vallario v. Vandehey*, 554 F.3d 1259, (10th Cir. 2009) (quoting *Shook v. Bd. of Cty. Comm'rs*,

543 F.3d 597, 604 (10th Cir. 2008)). As an initial matter, the court notes that the FDCPA does

not make equitable relief available as a remedy to private litigants. *See* 15 U.S.C. § 1692k

(specifying damages awards available and factors to be considered by the court when

determining what amount of damages to award); *see also Jacobson v. Persolve*, Case No. 14-cv-

735-LHK, 2015 WL 3523696, at *9–*10 (E.D. Cal. June 4, 2015) ("While the Ninth Circuit has

not addressed the issue, every circuit court that has considered this question has concluded that

private litigants may seek damages but not injunctive and declaratory relief under the FDCPA.").

But because the UCSPA contemplates injunctive relief, Utah Code Ann. § 13-11-19, a 23(b)(2)

class may be proper. *See Campo v. Am. Corrective Counseling Serv.*, 254 F.R.D. 585, 595–96

(N.D. Cal. 2008) (concluding that state law provided alternative statutory basis for equitable relief and therefore a basis for certification under Rule 23(b)(2)). And because CMS is alleged to have sent an identical letter to the potential plaintiffs and equitable relief in which the court determined the letter was a violation of law would provide the same relief across the class, Ms. Morrison has satisfied Rule 23(b)(2).

Rule 23(b)(3)'s requirements are also satisfied. A class may be certified under subpart (b)(3) if questions of law or fact pertaining to the class as a whole predominate over issues applying to individual class members such that a class action is the superior method of resolving the case. *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 615 (1997). In evaluating the predominance and superiority requirements, the court is to consider the following nonexhaustive factors:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action

*Id.* at 616 (quoting Fed. R. Civ. P. 23(b)(3)(A)–(D)).

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 622–23. "[T]the predominance prong 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *CGC Holding Co., LLC, v. Broad and Cassel*, 773 F.3d 1076, (10th Cir. 2014) (quoting 2 William B. Rubenstein et al., *Newberg on Class Actions* § 4:49, at 195–96 (5th ed. 2012)).

The legal and factual issues that this case presents are limited and apply equally to all who received a letter like the one Ms. Morrison received. The court must first determine whether CMS was a debt collector subject to the FDCPA or a supplier subject to the UCSPA. This question will be resolved the same way whether there is one plaintiff affected by the conclusion or 40,887. Next the court must determine whether the letter sent violated either the FDCPA or the UCSPA. Because the proposed class definition limits the class to only those who received a letter that "was similar or identical to Plaintiff's Exhibit A on behalf of Utah Imaging Associates," the court need only decide this issue with regard to one set of facts. If the letter Ms. Morrison received violated the law, so too did the letter that every other member of the class received. Therefore, common issues of law and fact are more important to resolution of this case than any potential individualized issues, though at this time the court can foresee no such issues.

The superiority requirement is also met. Superiority is met when a class action will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615. CMS argues that superiority is not met here because of the disparity between individual statutory damages under the FDCPA—$1,000 per plaintiff plus actual damages and attorney fees—and class damages—not more than the lesser of $500,000 or 1 percent of the debt collector's net worth. 15 U.S.C. § 1692k. CMS reasons that, assuming a 40,000 person class receiving a $500,000 award, each individual plaintiff will recover $12. (Response to Certification 13, ECF No. 37.) While the court does not dismiss that a potential plaintiff could recover more by bringing an individual action, any plaintiff who wishes to do so can opt out of this action and file separately. More likely, however, potential plaintiffs

may be unaware of their right, or otherwise uninclined, to bring such an action. *See Zuniga v. Bernalillo Cty.*, 319 F.R.D. 640, 680 (D. N.M. 2016) ("Although claims under [the FDCPA] may be more lucratively brought as individual actions, courts should assess the real-world likelihood that class members would bring their own actions, which implicates another factor the court should consider: the likelihood that proposed class members know they have a claim and whether they are savvy enough to pursue it."); *Janick v. Cavalry Portfolio Servs., LLC*, No. Civ. 06-3104, 2007 WL 1994026, at * 11 (D. Minn. July 3, 2007) ("[T]he truth is that the putative plaintiffs in this [FDCPA] case are not likely to know their rights and are not likely to pursue these claims on their own."). And resolution of the narrow legal and factual questions now before the court in a single action would otherwise promote economy and fairness. Therefore, a class action is the superior vehicle for the issues this case presents and certification under Rule 23(b)(3) is proper.

Because the alleged class satisfies both the 23(b)(2) and 23(b)(3) requirement, Ms. Morrison asks the court to certify a "hybrid class." (Motion to Certify 15, ECF No. 32.) Some courts have refused to certify a hybrid class in light of the Supreme Court's conclusion in *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011),[2] that a claim for monetary relief cannot be certified under Rule 23(b)(2) if the monetary relief sought is not incidental to the request for injunctive relief. *See, e.g.*, *Magallon v. Vital Recovery Servs., LLC*, 16-cv-02971, 2018 WL 1336291, at *5 (S.D. Cal. March 14, 2018) (determining that *Dukes* barred a hybrid FDCPA class action where plaintiff alleged a standardized letter merited declaratory relief and statutory

---

[2] The court notes that the cases upon which Plaintiff relies in requesting a hybrid class predate *Dukes*. (Motion to Certify 15, ECF No. 32.)

damages but failed to address the argument "that his claim is primarily for monetary relief"). But other courts have permitted such hybrid classes post-*Dukes*. *See* 2 William B. Rubenstein et al., *Newberg on Class Actions* § 4.38 (5th ed.). They have done so by certifying a 23(b)(2) class for the injunctive portion of the case and a 23(b)(3) class for the damages portion, *see, e.g.*, *Buchanan v. Tata Consultancy Servs., Ltd.*, 15-cv-1696, 2017 WL 6611653, at *23 (N.D. Cal., December 12, 2017). Here Ms. Morrison seeks to prevent CMS from further violating the FDCPA, making injunctive relief appropriate (Complaint ¶ 43, ECF No. 2), and she seeks statutory damages under both the FDCPA and the UCSPA (*Id.* ¶¶ 42, 49.) Therefore, the court concludes a "hybrid class" comprised of both a (23)(b)(2) class and a 23(b)(3) class is proper.[3]

Having concluded that the 23(a) and 23(b) requirements are met and exercising its duty under Rule 23(c)(1)(B), the court hereby defines the class to include

> All persons with addresses within Utah; who were sent any communication which was similar or identical to Plaintiff's Exhibit A on behalf of Utah Imaging Associates; to recover a consumer debt; in which this initial communication failed to provide the notice required by 15 U.S.C. § 1962g and/or 15 U.S.C. § 1692e(11); which were not returned undelivered by the United States Postal Service; from April 11, 2016 until April 11, 2017.

The class action will resolve whether CMS violated the FDCPA by failing to provide such notices and whether that its failure to comply with the FDCPA constitutes a violation of the

---

[3] The court notes that this distinction is significant because 23(b)(2) classes are "opt-in" classes, while 23(b)(3) classes are "opt-out" classes. *Dukes*, 564 U.S. at 361–63 ("The Rule provides no opportunity for (b)(1) or (b)(2) class members to opt out, and does not even oblige the District Court to afford them notice of the action," whereas "[i]n the context of a class action predominantly for money damages we have held that absence of notice and opt-out violates due process."). Here, potential class members due process right to $1000 in statutory damages is not compromised because they will have the right to opt-out of the class award.

UCSPA. Finally the court appoints Ms. Aimee Morrison as class representative, and her counsel, David McGlothlin of Hyde & Swigart and Ryan McBride of Kazerouni Law Group, as class counsel.

## SUMMARY JUDGMENT

Also pending before the court are cross motions for summary judgment of the FDCPA and UCSPA claims.[4] The parties agree that resolution of the claims turns on whether CMS was a "debt collector," as used in the FDCPA, and a "person" or "supplier," as used in the UCSPA, when it sent the letters about which Ms. Morrison complains. CMS stipulates that the letters do not contain the disclosures that the FDCPA §§ 1692e(11) and 1692g require debt collectors to include. (Defendant's Motion 1, ECF No. 20.) Ms. Morrison contends that without these disclosures, the letters CMS sent to Ms. Morrison and others violate the FDCPA and UCSPA. CMS counters that, because the debt was not in default, it was not acting as a debt collector, is not regulated by the identified statutory schemes, and was not required to include the disclosures, which it concedes are absent. (Defendant's Motion 2, ECF No. 20.)

## FACTS

Plaintiff Aimee Morrison's three children received medical services from Utah Imaging Associates July 7, 2016. (Defendant's Motion 4, ECF No. 20; Plaintiff's Motion 3, ECF No. 36.) UIA charged her $36.00 per child, but based on UIA standard practice and believing her insurance would cover them, Ms. Morrison did not pay UIA. (Defendant's Motion 4, ECF No. 20; Plaintiff's Opposition Brief 7, ECF No. 35.) No party has provided evidence that Ms.

---

[4] The issue of damages is not resolved by the court's disposition of the pending motions and remains to be litigated.

Morrison entered a contract with UIA,[5] leaving the court to conclude that UIA provided the medical services without an express contract and that no contract exists providing the terms for payment. (Plaintiff's Exhibit B, ECF No. 36-3; Plaintiff's Reply Brief 4–5; ECF No. 42.)

UIA then sent Ms. Morrison a bill for $36 per child on July 17, 2016. (Plaintiff's Opposition Brief 6, ECF No. 35.) The bill stated, "You are responsible for payment in full within 20 days." (*Id.*; Plaintiff's Opposition Exhibit E.) Ms. Morrison again did not make a payment, and UIA sent a second bill to Ms. Morrison on August 21, 2016, bearing the warning, "This is your FINAL NOTICE. Failure to pay this balance in full within 15 days may result in further collection action." (Plaintiff's Opposition Brief 6–7, ECF No. 35; Plaintiff's Opposition Exhibit F.) On October 13, 2016, UIA assigned Ms. Morrison's three accounts to CMS. (Defendant's Motion 5, ECF No. 20; Plaintiff's Opposition Exhibit C 26:4–11, ECF No. 35-5.) On October 14, 2016, CMS sent Ms. Morrison three identical letters—one for each child's account— notifying her that "[UIA] ha[d] contracted with [CMS] to handle [her] account" and asking her to "[p]lease remit the balance due to" CMS on UIA's behalf. (Defendant's Motion 4, ECF No. 20; Plaintiff's Exhibit B UIA006, ECF No. 36-3.) The letters indicate that CMS "is a billing service." (Plaintiff's Exhibit B UIA006, ECF No. 36-3.) They also say no interest has accrued and that accrual can be avoided by "paying your account in full." (*Id.*) Although no interest had accrued at the time the letter was sent to Ms. Morrison, interest began accruing on October 13, 2016. (Plaintiff's Opposition Exhibit C 26: 7–11.)

---

[5] It appears Ms. Morrison took her three children to a third-party provider that performed scans, which scans UIA read. UIA then charged Ms. Morrison for its reading of the scans. But Ms. Morrison's relationship was with the third-party provider; she had no direct relationship with UIA.

After receiving CMS's letter, Ms. Morrison did not pay. And on November 21, 2016, her three accounts were assigned to Express Recovery Services (ERS). (Defendant's Motion 5, ECF No. 20.) ERS is a debt collector and is licensed as such in the state of Utah. (*Id.*) The ERS letters dated November 21, 2016, are not at issue here. Ms. Morrison has since paid off each of the three accounts. (Plaintiff's Opposition Exhibit C 31: 9–11, ECF No. 35-5.)

In their respective statements of facts, the parties make competing representations about the role CMS played in the collection of Ms. Morrison's debt to UIA. CMS asserts that at the time of the assignment to CMS, Ms. Morrison's accounts were not in "default," based on the declaration of Patricia Harms, chief executive officer of UIA. (Defendant's Exhibit A ¶¶1 & 7, ECF No. 20-1.) Citing Michelle Camp, chief operating officer of ERS, CMS also represents that it "never collects defaulted accounts" and that it is simply a "billing company," not a debt collector. (Defendant's Exhibit B ¶¶ 5 & 7, ECF No. 20-2.) Ms. Morrison disputes each of these representations. (Plaintiff's Opposition Brief 4–5, ECF no. 35.)

But, as Ms. Morrison points out, CMS is in fact ERS doing business as CMS.[6] (Plaintiff's Opposition Brief 6, ECF No. 35.) There are four CMS employees. (*Id.* at 8.) ERS pays and supervises those employees. (*Id.*) In fact, if there is not enough CMS work, the four CMS employees work on ERS tasks. (*Id.*) CMS and ERS also use the same collection software and programs. (*Id.* at 9.) And the "transfer" of files from CMS to ERS, at which time CMS contends

---

[6] As further evidence that CMS and ERS are legally indistinguishable, the official who CMS designated Ms. Camp as its Rule 30(b)(6) representative. Ms. Camp's official title is Chief Operating Officer for Express Recovery Services. (Plaintiff's Opposition Exhibit C 7: 7–10.) And when asked if CMS was a separate legal entity from ERS, Ms. Camp answered, "I don't know how it would be defined as a separate legal entity. I mean, it's registered with the state as Express Recovery doing business as Clear Management Solutions." (*Id.* 9: 10–15.)

the debts go into default, requires only that an employee to log in to the shared software and move the file to a different location of the joint server. (*Id.*) The court addresses the questions of default, debt collection, and the significance of the relationship between ERS and CMS in its analysis.

## STANDARD

Summary judgment is proper when the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the litigation. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Id.* The nonmoving party may not rest solely on allegations on the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. The court must "view the evidence and draw reasonable inferences therfId.efrom in a light most favorable to the nonmoving party." *Commercial Union Ins. Co. v. Sea Harvest Seafood Co.*, 251 F.3d 1294, 1298 (10th Cir. 2001).

## ANALYSIS

### FDCPA

Ms. Morrison has alleged three FDCPA violations. (Complaint, ECF No. 2.) Congress enacted the FDCPA "in part, to 'eliminate abusive debt collection practices by debt collectors.'" *Obduskey v. Wells Fargo*, 879 F.3d 1216, 1219 (10th Cir. 2018), cert. granted sub nom.

*Obduskey v. McCarthy & Holthus LLP*, 138 S. Ct. 2710 (2018) (quoting 15 U.S.C. § 1692(e)). It states, in relevant part, that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. It prohibits debt collectors from engaging in particular types of communications and imposes certain notice requirements on debt collectors. *Id.*; 15 U.S.C. § 1692g. It imposes on debt collectors certain notice and disclosure requirements.

"To prevail under the FDCPA, a plaintiff must prove that the defendant is a 'debt collector' who is trying to collect a 'debt' from the plaintiff in violation of some provision of the FDCPA." *Obduskey*, 879 F.3d at 1219. The FDCPA defines debt collector as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due another." 15 U.S.C. § 1692a(6). The statute, however, carves out limited exceptions, including the following: "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due to another to the extent such activity . . . concerns a debt which is not in default at the time it was obtained by such person." *Id.* § 1692a(6)(F)(iii). The act does not define "default." The court must, therefore, determine whether CMS was a debt collector or if it was shielded from potential FDCPA liability because the debt was not in default.

First, CMS satisfies the statutory definition of debt collector. CMS is not a legally distinct entity from ERS, and ERS admits that it is a debt collector and that its primary purpose is debt collection. ERS is licensed in the state of Utah as a debt collector. This alone is sufficient to qualify CMS as a debt collector. CMS argues that CMS and ERS should be viewed as distinct

entities and that ERS's status as a debt collector should not be imputed to CMS, but as a matter

of law that is simply not true. See *Sewell v. Xpress Lube*, 321 P.3d 1080, 1085 (Utah 2013)

(quoting *Fried v. Wellesley Mazda*, 2010 Mass.App. Div. 36, 2010 WL 1139322 (Mass. Dist. Ct.

2010)) ("[T]he 'use of the designation 'doing business as' does not create a separate legal entity

that may be made a party defendant.'"); *see also Duval Midwest Auto City, Inc.*, 425 F. Supp.

1381, 1387 (D. Neb. 1977) ("The designation 'd/b/a' means 'doing business as' but is merely

descriptive of the person or corporation who does business under some other name. Doing

business under another name does not create an entity distinct from the person operating the

business.").

CMS's claim that as a matter of fact it is not a debt collector but "a billing service that

assist[s] companies with accounts not paid at the time service is rendered" (Defendant's Exhibit

B ¶6, ECF No. 20-2) is similarly unavailing.[7] The evidence demonstrating what CMS actually

does, in other words what it means that CMS "assists companies," supports as a matter of law

that CMS is engaged in debt collection activity. CMS "act[s] as an extension of" their clients'

"billing office in-house and make courtesy calls, set up payment plans, payment reminders,

things along those lines, prior to—so there was some patient communication prior to the account

just being written off to bad debt." (Plaintiff's Opposition Exhibit C 8: 21–9: 5, ECF No. 35-4.)

And in her deposition Ms. Camp, COO for ERS and 30(b)(6) representative for CMS, agreed

---

[7] The officers' statements are conclusory and cannot support summary judgment. And a parties
description of itself is not a basis upon which the court should make the legal conclusion of
whether it must comply with the FDCPA. See *Romine v. Diversified Collection Servs., Inc.*, 155
F.3d 1142, 1149 (9th Cir. 1998). The relevant consideration is not what the defendant titles itself
but how it conducts itself. *Id.*

that each letter sent to Ms. Morrison was "an attempt to collect $36" from her. (*Id.* 36: 10–12.) Because CMS is simply an alternative name for ERS, an acknowledge debt collector, and because CMS was engaged regularly in seeking payment on debts for another entity, UIA, it was a debt collector. Nevertheless, it may be excluded from the statutory definition—and therefore from regulation under the FDCPA—if the debt it was collecting was not in default. *See Henson v. Santander Consumer USA Inc.*, 137 S.Ct. 1718, 1723 (2017).

The FDCPA does not define default. *Alibrandi v. Fin. Outsourcing Servs, Inc.*, 333 F.3d 82, 86 (2d. Cir. 2003). CMS argues that, in the absence of a statutory definition, the court must look to the contract governing the relationship of the parties. (Defendant's Response 12–12, ECF No. 40.) This is consistent with the approach many cases have taken. *See Magee v. AllianceOne, Ltd.*, 487 F. Supp. 2d 1024 (S.D. Ind. 2007) (cataloguing cases that stand for the proposition that "in the absence of a statutory definition of default, the definition (if there is one) contained in the applicable loan or credit agreement is used to determine if and when the debt is in default" but declining to adopt that approach under the circumstances before the court). But that approach is unworkable in this case, because the creditor (UIA) and the debtor (Ms. Morrison) never entered an express contract and as a result there is no express or implied contractual definition of default for the court to apply. Where there is an absence of a contractual term between debtor and creditor, the courts have looked to the plain meaning of the statute. *Cf. Romine v. Diversified Collection Servs., Inc.*, 155 F.3d 1142, 1145–46 (9th Cir. 1998) ("In the absence of statutory definition, a statutory term will be accorded its ordinary meaning.").

The court is unpersuaded by CMS's argument that it should instead defer to the definition of default in the contract between CMS and UIA. Permitting the creditor to define default

without knowledge and input from the debtor, either because the debtor is not a party to the contract containing the definition or because the definition reserves discretion for the creditor to decide on a definition at a later date, would controvert the purpose of the FDCPA. *Magee*, 487 F. Supp. 2d at 1027–28; *see also Hartman v. Meridian Fin. Servs., Inc.*, 191 F. Supp. 2d 1031 (W.D. Wis. 2002) ("[T]he fact that a creditor or third-party debt collector 'considers' a debt to be in default has no bearing on whether the debt is truly in default."). Specifically, it would allow for the creditor to set the date in which a debt goes into default immediately after the transfer to the debt collector, allowing an entity that would otherwise be governed by the statute to avoid statutory accountability. *Magee*, 487 F. Supp. 2d at 1027–28. This is particularly true where, as here, the debtor had no knowledge of the contract or its definition of default. Therefore, this court will apply the plain meaning of default.

Webster's dictionary defines default in the economic context to mean "a failure to pay financial debts." https://www.merriam-webster.com/dictionary/default?utm_campaign=sd&utm_medium=serp&utm_source=jsonld. Alternatively, "default" is the failure "to fulfill a contract, agreement, or duty: such as . . . to fail to meet a financial obligation." Black's Law Dictionary similarly defines default as "the omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due." DEFAULT, Black's Law Dictionary (10th ed. 2014).

These definitions demonstrate that the plain meaning of the term "default" is that a debt is owing. While adopting a strict definition of default such that a bill only one day late may not be in consumer's interest, *see Alibrandi*, 333 F.3d at 87 ("[A] debtor arguing that his debt was in default at the earliest possible time . . . has the paradoxical effect of immediately exposing

debtors to the sort of adverse measures, such as acceleration, repossession, increased interest rates, and negative reports to credit bureaus."), the court need not reach such an extreme position under the circumstances in this case. The parties agree that Ms. Morrison received a second billing notice from UIA on August 21, 2016, that included the following notice: "This is your FINAL NOTICE. Failure to pay this balance in full within 15 days may result in further collection action." (Plaintiff's Opposition Brief 6–7, ECF No. 35; Plaintiff's Opposition Exhibit F.) The parties also agree that the debt was assigned to CMS on October 13, 2016—over fifteen days after UIA's "FINAL NOTICE." CMS presents no argument that this notice failed to put the account in default other than the assurance that CMS does not collect debts that are in default and that the procedure contemplated in the contract between UIA and CMS was for the debt to be "in default" only when it went to ERS. (Defendant's Response Brief 13, ECF No. 40.) But these assurances have no basis in the statute and they place all of the power in the hands of the creditors and debt collectors from whom the FDCPA protects consumers. Therefore, the court concludes that the debts were in default by the time CMS obtained them. This conclusion is further supported by the fact that the debt began accruing interest upon its transfer to CMS. None of the facts are in dispute, allowing the court to find as a matter of law that the debt was in default. Because CMS/ERS is otherwise a debt collector, the court concludes its conduct must comply with the FDCPA, and the failure to do so in this case violated the statute.[8] For these reasons, CMS's Motion is denied and Ms. Morrisons's is granted on the issue of an FDCPA violation.

---

[8] The court need not analyze whether a violation existed as CMS the letter was not compliant with the FDCPA's notice requirements. (Defendant's Motion 1, ECF No. 20.)

**UCSPA**

Both parties also move for summary judgment of the Utah Consumer Sales Practices Act claim. (Defendant's Motion 8–9, ECF No. 20; Plaintiff's Motion 18–22, ECF No. 35.) As an initial matter, each of CMS's UCSPA arguments can be reduced to the claim that it is not a debt collector and the debts are not in default, which facts CMS believes preclude it from UCSPA liability. Without determining whether those facts would preclude UCSPA liability, the court denies CMS's motion on the UCSPA claim in light of its disposition and conclusions on the FDCPA claim.

Whether Ms. Morrison has proven as a matter of law that CMS violated the Act requires greater attention. She alleges violations of Utah Code sections 13-11-4, and 13-11-5. Section 13-11-4 prohibits "deceptive act[s] or practice[s] by a supplier in connection with a consumer transaction . . . whether it occurs before, during, or after the transaction." Utah Code § 13-11-4. Section 13-11-5 similarly prohibits "[a]n unconscionable act or practice by a supplier in connection with a consumer transaction that violates this act." *Id.* § 13-11-5. Therefore, Ms. Morrison must demonstrate that (1) CMS was a supplier, (2) that CMS committed a deceptive or unconscionable act, and (3) that act was in connection with a consumer transaction.

A "supplier" is "a seller, lessor, assignor, offeror, broker, or other person who regularly solicits, engages in, or enforces consumer transactions, whether or not he deals directly with the consumer." *Id.* § 13-11-3(6). A consumer transaction is "a sale, lease, assignment, award by chance, or other written or oral transfer or disposition of goods, services, or other property, both tangible and intangible (except securities and insurance)," including "a solicitation." *Id.* § 13-11-3(2). The letter CMS sent Ms. Morrison was a request for payment that satisfies the commercial

transaction requirement. It was a solicitation. And CMS was a supplier as its business is to solicit payment for debts. Therefore, the first and third elements are satisfied.

Ms. Morrison argues that CMS's conduct was both deceptive because it "knowingly" and "intentionally omitted the notices required by the FDCPA" and such omission was unconscionable because it left Ms. Morrison in a position of not knowing "the proper way to respond based on the information given to" her. (Plaintiff's Motion 21, ECF No. 36.) The court agrees the failure to provide the proper notices identifying CMS as a debt collector, as required by law, was deceptive. CMS knowingly misrepresented the nature of its collections activity by hiding behind a d/b/a in attempt to avoid registering as a debt collector and providing the requisite notices; that was a knowing and intentional deceptive act.[9] There may, however, be a factual dispute as to whether CMS's letter was unconscionable. Generally, unconscionability requires some "extreme unfairness." UNCONSCIONABILITY, Black's Law Dictionary (10th ed. 2014). While the court agrees that CMS acted deceptively, there is not a factual basis for the court to conclude as a matter of law that CMS's misconduct rises to the level of unconscionability. Rather, she has simply repackaged the CMS's allegedly deceptive conduct and called it unconscionable. Nevertheless, because CMS acted deceptively, the court is persuaded that it violated the UCSPA and Ms. Morrison is entitled to summary judgment on that question.

---

[9] CMS's argument that Ms. Morrison has not proven her UCSPA claim is simply that the debt was not in default and therefore the failure to include FDCPA required warnings and notices was neither deceptive or unconscionable. (Defendant's Objection 15–16, ECF No. 40.) Defendant makes no other arguments, suggesting that it agrees that a violation of the FDCPA is sufficient to constitute a violation of the UCSPA.

**CONCLUSION**

For the reasons stated herein, the court certifies the class proposed by Ms. Morrison (ECF No. 32), denies CMS's Motion for Summary Judgment (ECF No. 20) and grants Ms. Morrison's Motion for Summary Judgment (ECF No. 36).

DATED this 4th day of January, 2019.

BY THE COURT:

Clark Waddoups
United States District Court Judge